```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
SHAUNICE VALENTINE,                                              :
                                                                 :
                                    Plaintiff,                   :     21 Civ. 4616 (JPC)
                                                                 :
                -v-                                              :     OPINION AND ORDER
                                                                 :
HNTB CORPORATION,                                                :
                                                                 :
                                    Defendant.                   :
                                                                 :
-----------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

      Plaintiff Shaunice Valentine brings this action against her former employer, Defendant HNTB Corporation ("HNTB"), accusing the company of firing her for reporting a fellow employee's racially-tinged treatment of individuals visiting HNTB's community office. She alleges that her termination amounted to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"). Following the close of discovery, HNTB has moved for summary judgment on all claims. Because Plaintiff has failed to show that she engaged in protected activity or that HNTB's professed motivations for putting her on a performance improvement plan and for her ultimate termination are pretextual, HNTB's motion is granted as to Plaintiff's Title VII claim. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYCHRL claim, which is dismissed without prejudice.

I. **Background**

A.   **Facts**[1]

HNTB hired Valentine on July 17, 2019 as a Senior Community Relations Assistant in its New York City office, commonly known as the "Community Center." Deft. 56.1 Stmt. ¶¶ 1-2. At the time, HNTB had been tasked with redevelopment of the John F. Kennedy International Airport ("JFK Project"), and the Community Center handled community relations surrounding this project. *Id.* ¶ 3. HNTB's client for the JFK Project was the Port Authority of New York and New Jersey ("Port Authority"). *Id.* ¶ 4.

As might be expected given a project this size, HNTB worked closely with the Port Authority on the JFK Project, with a Port Authority employee embedded at the Community Center. *Id.* ¶ 6. Indeed, Selvena Brooks-Powers and Nantasha Williams, Plaintiff's direct supervisors, partially reported to the Port Authority. *Id.* ¶¶ 5-6. Eight individuals worked at the Community Center: the Port Authority employee, a third-party security guard, and six HNTB employees including Plaintiff. *Id.* ¶¶ 6, 8. One of those HNTB employees was Jule Grant, who worked at the Community Center as a secretary. *Id.* ¶ 8.

During a July 27, 2019 meeting with Williams, Plaintiff raised concerns about "[t]he way

---

[1] The following facts are drawn primarily from Defendant's statement of undisputed material facts pursuant to Local Civil Rule 56.1(a), Dkt. 29 ("Deft. 56.1 Stmt."), Plaintiff's counter-statement under Rule 56.1(b), Dkt. 30 ("Pl. Counter 56.1 Stmt."), and the declarations and exhibits submitted in support of HNTB's motion for summary judgment. Unless otherwise noted, the Court cites only to HNTB's statement of undisputed material facts when Plaintiff does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add her own "spin" on the fact or otherwise dispute the inferences drawn from it. Additionally, the Court does not consider evidence not presented in the parties' 56.1 statements. "[T]he Second Circuit has been clear that a district court 'is not required to consider what the parties fail to point out in their Local Rule 56.1 statements.'" *McCall v. Genpak, LLC*, No. 13 Civ. 1947 (KMK), 2015 WL 5730352, at *13 (S.D.N.Y. Sept. 30, 2015) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)); *accord Genova v. Cnty. of Nassau*, 851 F. App'x 241, 244 (2d Cir. 2021) (same).

2

[Grant] was treating the high school intern and, again, the way she was treating people as they came through the door," stating further "that Ms. Grant had been looking at and speaking inappropriately to the intern." *Id*. ¶¶ 10-12 (first alteration in original).  Plaintiff told Williams that Grant "was very short" with people at the front desk and "did not communicate what she was supposed to communicate to them about the opportunities that were available." *Id.* ¶ 13.  Plaintiff did not mention any particular people or groups to whom Grant spoke in this manner; she "was just telling [Williams] in general the way [Grant] was treating people as they were coming in." *Id.* ¶ 14; Dkt. 29-2 at 31:2-32:9 (Valentine deposition).

About a month later, on August 29, 2019, Plaintiff wrote an email to her supervisors, Brooks-Powers and Williams, to "sum up" her first month.  Deft. 56.1 Stmt. ¶ 15.  Plaintiff again complained about Grant in this email, writing, in pertinent part:

> As I expressed to Nantasha [Williams] on several occasions the front desk is a huge concern for me.  Aside from a number of negative interactions I have experienced and witnessed I am concerned with the way calls are handled and the manner walk ins are treated.  Jule Grant told me yesterday after having trouble transferring a call to me "I am not feeling well and when I am not feeling well I don't have any patience[."]  When Ms. Grant returned from being hospitalized two weeks ago she sat at the front desk with a hospital mask strapped on from ear to ear and said this was due to the smell on the access a ride car trip.  This was also the day she told a reporter of a Spanish news show to "sign-o your name-o in the book-o[,"] and when we had a conversation about this she gave me the impression she would say that again because in her words "that is Spanish and I used to speak Spanish fluently[."]  Along with these concerns I also learned from a number of coworkers Ms. Grant regularly speaks negatively about the two of you and recently spoke very negatively about me to outside stakeholders.
>
> We are all getting to know one another and all while we have important tasks, you have no idea how much it pains me to place a complaint in about a team member especially one in obvious ill health but this I feel has also spilled over into the functionality of the center.  I can only speak for myself but I tend to find the alternative to approaching Ms. Grant when it comes to matters that really should go to the "office manager" as while it seems things that could be considered officer manager duties are being handled by everyone else but the person assigned to the position, i.e. the JFK Redevelopment calendar scheduling, room setup, and more.  I just believe in being honest, it does not seem this office really has a[n] office

3

manager/receptionist and it really needs one. *Id.* ¶ 16. About a week later, Plaintiff reiterated to Williams that Grant was "treating people very mean, especially those who are Spanish speaking," and asked about her August 29, 2019 email. *Id*. ¶¶ 17-21.

On September 10, 2019, Brooks-Powers responded to Plaintiff's August 29, 2019 email, thanking Plaintiff for sharing her thoughts. *Id.* ¶ 23. Plaintiff replied the following day saying, "I do hope there is a remedy soon, every other day there is a negative encounter with this person, yesterday I was blamed for breaking the monitor and accused of trying to take her 'office manager' duties away from her. This is embarrassing in the presence of visitors to the center. Just a bad look right now." *Id*. ¶ 24. Plaintiff then followed up a few days later on September 17, 2019, sending her supervisors another email expressing her concerns about Grant and her opinion that "Grant's presence negatively impacts how this office is perceived." *Id.* ¶ 25. In this email, Plaintiff cited examples of Grant's behavior that had exhausted Plaintiff's "patience," including an interaction with the office security guard where she "spoke to him like he was a child" and an interaction with a visitor to whom Grant was "short" and "unpleasant." *Id*. Both Brooks-Powers and Williams responded to Plaintiff's September 17, 2019 email, thanking her for sharing these concerns. *Id*. ¶ 28.

On October 17, 2019, a human resources employee from HNTB, Mahfuza Chowdhury, convened a "reset meeting" with Plaintiff, Grant, and Williams. *Id*. ¶¶ 29-30. Plaintiff understood the purpose of this meeting was "to talk to Jule Grant and [Plaintiff] about the negative interactions they were having with each other." *Id*. ¶ 31 (brackets omitted). The group discussed "what was happening in the office with [Grant] and [Plaintiff]," including Grant's "interaction with the Spanish news reporter." *Id*. ¶¶ 32-33 (second alteration in original). Plaintiff also told Chowdhury

4

that Grant was "inappropriately handling not just the news reporter but all Spanish-speaking families." *Id.* ¶ 34.

Another "reset meeting" occurred on November 21, 2019, this time between only Plaintiff and Brooks-Powers. *Id.* ¶¶ 35-36. Plaintiff and Brooks-Powers discussed "the way that [Grant] was treating [Plaintiff]," among other topics, but the meeting did not address "how [Grant] interacted with Spanish-speaking families." *Id.* ¶¶ 38-39.

Grant took medical leave on November 25, 2019, and remained on leave for the rest of the year, returning to work on January 14, 2020. *Id.* ¶¶ 41, 43.

On January 17, 2020, just three days after Grant's return, Plaintiff sent a lengthy email to her supervisors titled, "The Reset Failed," and documenting the history of her problems with Grant. *Id.* ¶ 43. Plaintiff stated that Grant "is creating a very hostile work environment for me and I already reported for others in the very small office as well," and that Grant "has been hostile to me from my first day and every time I speak with her." *Id.* Plaintiff expressed her concern that "Grant will continue to be contentious, uncooperative and worst of all confrontational towards me to the point I feel this is abusive." *Id.* Plaintiff referred to Grant as a "mentally disturbed individual who is not producing in any significant way." *Id.* This recap of Plaintiff's history with Grant did not mention Grant's treatment of Spanish-speaking visitors to the Community Center. Dkt. 29-5.

That same day, on January 17, 2020, Brooks-Powers sent an email to Williams and Chowdhury, expressing that "they would like to move forward with a [Performance Improvement Plan] for both [Grant] and Plaintiff." Deft. 56.1 Stmt. ¶ 47. Geoffrey Maracchini, the Senior Human Resources Director for HNTB's East Region and Williams's and Chowdhury's supervisor, had received a number of complaints and concerns about Plaintiff from other HNTB employees in

5

late 2019 and early 2020. *Id.* ¶ 48; Dkt. 29-4 ¶ 16.[2] These included that "Plaintiff was having difficulty working with" Grant; that Plaintiff was "having performance issues"; that Plaintiff was "unprofessional in her interactions with her supervisors"; and that "the Port Authority had raised complaints with HNTB about Plaintiff's relationship with [Grant]." Deft. 56.1 Stmt. ¶ 48. HNTB was "particularly concerned with Plaintiff's poor performance and working relationship with Ms. Grant being visible to the Port Authority," the sole client on the JFK Project and one with whom HNTB "had a close relationship." *Id*. ¶ 49. HNTB accordingly decided to place Plaintiff and Grant on a "performance improvement plan ('PIP')." *Id*. ¶ 50.

On January 23, 2020, Plaintiff sent a follow up to her January 17 email, inquiring about when she would receive a response. *Id*. ¶ 51. Chowdhury replied the following day, advising that she had set up a meeting for them. *Id*. ¶ 52. Plaintiff responded by email, saying "actually, what seems to be set up is a meeting regarding 'performance expectations' this is another discussion." *Id*. ¶ 53. Chowdhury said that the "meeting was set to clear out job expectations as well since you have mentioned many times you are not clear on what your role is" in relation to Grant's role. *Id*. ¶ 54. Plaintiff disagreed, saying that she felt the two issues needed to be addressed separately and that she felt she was "being put in an abusive situation." *Id*. ¶ 55.

Both Plaintiff and Grant were placed on PIPs on January 28, 2020. *Id*. ¶ 56. Plaintiff's PIP catalogued a number of reasons for "unsatisfactory performance," including that she "[f]ail[s]

---

[2] Plaintiff objects to Defendant's inclusion in its Rule 56.1 statement of this assertion and others from Maracchini's declaration, maintaining that the "referenced citation contains no record of the statements referenced therein," or "the referenced citation does not contain a record of such a statement produced in this case," citing to Federal Rule of Civil Procedure 56(c)(1)(A). *See, e.g.*, Pl. Counter 56.1 Stmt. ¶¶ 48-50, 66-68. But the cited source, Maracchini's own declaration, does refer to these statements. *See* Fed. R. Civ. P. 56(c)(1)(A) (allowing for citation to "particular parts of materials in the record" including "affidavits or declarations"). As Plaintiff has not otherwise opposed these statements or presented evidence contradicting them, they are proper for the Court to consider in resolving Defendant's motion.

to complete assigned tasks in a timely fashion," "[c]riticizes other team members and shows minimal appreciation for certain team member efforts," "[s]hows reluctance when it comes to undertaking various work-related activities with certain team member(s)," is "[u]nable to receive and give constructive feedback to certain team member(s)," and "[u]se[s] . . . discriminatory language." Id. ¶ 57. Grant's PIP also cited that she "[s]hows reluctance when it comes to undertaking various work-related activities with certain team member(s)" and "[c]riticizes other team members and shows minimal appreciation for certain team member efforts," among other reasons. Id. ¶ 58. Plaintiff's PIP was presented to her in person on January 28, 2020. Id. ¶ 59.

On January 30, 2020, Plaintiff sent a follow-up email addressing the PIP, reiterating her concerns about Grant, and stating in pertinent part: "I had to leave the office from this meeting pretty upset. . . . [M]y well-being and my concerns are not being addressed. . . . [M]y working relationship is terrific with everyone with exception of one person." Id. ¶ 63. Plaintiff then sent a second follow-up email on February 5, 2020, which requested that the PIP be removed from her record, maintaining that it was unjustified, and described another occasion when Grant was hostile towards her. Id. ¶ 64.

Following HNTB's implementation of Plaintiff's PIP, Maracchini continued to receive complaints and concerns from HNTB employees regarding Plaintiff's workplace conduct, and he further learned of Plaintiff's complaints about the performance plan. Id. ¶ 65. In February 2020, Maracchini worked with Chowdhury and Chowdhury's supervisor, Natalie Benjamin, to address Plaintiff's complaints about her PIP and her ongoing "work performance issues." Id. ¶ 66. That same month, Maracchini also personally spoke with Plaintiff over the phone regarding her work performance, her relationship with Grant, and her PIP. Id. ¶ 67. Yet, according to HNTB, Plaintiff's work performance did not improve in the ensuing spring of 2020. Id. ¶ 68. And

Plaintiff acknowledges that she did not "change anything about the way [she] was acting after [she] received [her] PIP." *Id.* ¶ 74.

Plaintiff's 2019 Performance Review also reflected problems in her work performance. Plaintiff's supervisors recorded that she "Inconsistently Met Expectations" and gave her a 2/5 rating. *Id.* ¶ 75. The 2019 Performance Review additionally reported that Plaintiff had "inconsistencies" in her performance objectives, including "the monitoring and responding of JFK emails." *Id.* ¶ 76. Plaintiff, however, rated herself as "Far Exceeded Expectations," a 5/5 rating. *Id.* ¶ 77.

In April 2020, Brooks-Powers discussed the 2019 performance evaluation with Plaintiff, raising concerns regarding the "timeliness" of Plaintiff's work. *Id.* ¶¶ 78-79. Following this performance evaluation, Plaintiff's supervisors and members of the HNTB Human Resources staff began discussing Plaintiff's "performance issues" and her "unprofessional behavior with Mr. Maracchini." *Id.* ¶ 80. Around this time, "Plaintiff told HNTB that she would take her complaints directly to the Port Authority." *Id.* ¶ 81. On April 13, 2020, Brooks-Powers emailed Plaintiff again expressing displeasure about her failure to complete an assignment in a timely manner: "We need to discuss getting this out more timely. This is the second time that I am raising the need to get this out timely. Furthermore, Nantasha [Williams] just shared that you said you will finish tomorrow. This is totally unacceptable." *Id.* ¶¶ 82.

On April 16, 2020, Chowdhury sent an email to Benjamin, stating that Plaintiff had "threatened her managers to file a complaint with official government authorities" due to her performance review, and that Plaintiff "[d]ismisses instructions" and "delegate[s] her work without discussing with her managers." *Id.* ¶ 84. About a month later, on May 14, 2020, Plaintiff sent an email to various supervisors at HNTB saying that she was "under a lot of stress due to a

8

hostile work environment caused by another HNTB staff member" and that her "work efforts have been sabotaged by [her] managers." *Id*. ¶¶ 96-98 (alteration in original).

Around this time in spring of 2020, HNTB received complaints from the Port Authority about Plaintiff, expressing that HNTB "needed to resolve Plaintiff's work performance and working relationship issues because it was affecting the JFK project." *Id*. ¶ 90. In May 2020, Maracchini met with other HNTB employees, including Plaintiff's direct supervisors, about terminating Plaintiff's employment. *Id*. ¶ 91. Maracchini and Plaintiff's supervisors discussed Plaintiff's "poor work performance, her relationship with Grant, the Port Authority's concerns, and the Port Authority's financial situation as it related to the JFK Project." *Id*. ¶ 92. As a result of these discussions, HNTB decided to terminate Plaintiff's employment. *Id*. ¶ 93. HNTB then reached out to the Port Authority to see if they had any objection to Plaintiff's termination, to which the Port Authority's representative responded bluntly: "That flows well from where I sit." *Id*. ¶¶ 94-95.[3]

On May 15, 2020, HNTB terminated Plaintiff's employment. *Id*. ¶ 99. HNTB maintains that Plaintiff's alleged "opposition to racial and ethnic discrimination had nothing to do with the decision to terminate Plaintiff's employment," *id*. ¶ 101, but that her termination was due to "her work performance, her poor relationship with [Grant], her unprofessionalism, the complaints HNTB received from the Port Authority, and Port Authority downsizing efforts in the wake of COVID-19," *id.* ¶ 100.

---

[3] Plaintiff objects to Defendant's reference to these communications saying that "this is not a statement of fact that is supported by admissible evidence; rather, it is a summary of numerous email[s] exchanged between multiple parties that were not disclosed as witnesses." Pl. Counter 56.1 Stmt. ¶ 94. But Defendant's Rule 56.1 statement directly quotes from those emails, which also have been submitted as exhibits. *See* Dkt. 29-15.

9

B.  **Procedural History**

Plaintiff initiated this action on May 24, 2021.  Dkt. 1 ("Compl.").  Plaintiff has pleaded two causes of action: (1) retaliation in violation of Title VII, *id.* ¶¶ 12-18, and (2) retaliation in violation of the NYCHRL, *id.* ¶¶ 19-24.  Following mediation and discovery, *see* Dkts. 9-10, 19, Defendant moved for summary judgment on July 7, 2022, Dkts. 26-29.  Plaintiff opposed that motion on July 22, 2022, Dkts. 30-31, and Defendant filed its reply on August 5, 2022, Dkt. 32.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings."  *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting

*Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

### III. Discussion

**A.    Title VII**

Plaintiff contends that HNTB violated Title VII by terminating her employment because she opposed racial and ethnic discrimination in her place of employment. *See* Compl. ¶ 14.

Title VII "makes it unlawful for an employer to discriminate against an employee for opposing any practice made unlawful by Title VII." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011); *see* 42 U.S.C. § 2000e–3(a). Title VII retaliation claims are assessed under the three-step burden-shifting framework outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). At the first step, a plaintiff must establish a *prima facie* case of unlawful retaliation by submitting "sufficient admissible evidence to allow a trier of fact to find: (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter

11

a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." *Cox v. Onondaga Cnty. Sherriff's Dep't*, 760 F.3d 139, 145 (2d Cir. 2014). That causal connection requires that retaliation be a "but-for cause of the employer's adverse action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015). "It is not enough that retaliation was a substantial or motivating factor in the employer's decision," though but-for causation "does not . . . require proof that retaliation was the only cause of the employer's action, . . . only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 90-91.

"If the plaintiff sustains this initial burden, a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). "The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (internal quotation marks omitted). If the defendant does so, then the plaintiff must show that the "non-retaliatory reason is a mere pretext for retaliation." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

Defendant argues that Plaintiff cannot establish her *prima facie* case because she did not engage in protected activity and because HNTB had "numerous, non-retaliatory reasons to terminate [Plaintiff's] employment and Plaintiff cannot show pretext." Dkt. 27 ("Motion") at 4. The Court agrees.

    **1.    Protected Activity**

HNTB argues that Plaintiff did not engage in protected activity, because her grievances against Grant were personal and not related to conduct that violated Title VII. *Id.* at 4-9. Plaintiff responds that she "made numerous complaints (written and oral) of racist epithets centering on an employee that was directed towards a visitor to her employer's place of business" and that she

"showed a good-faith belief that a fellow employee's mocking, teasing, and impersonating an archetypical racist Latino caricature, is prohibited under the law." Dkt. 31 ("Opposition") at 7. While not explicit in her opposition brief, Plaintiff appears to be referring to three complaints she made about Grant's behavior toward visitors to the Community Center. The first is Plaintiff's complaint to her supervisors on August 29, 2019 that Grant "told a reporter of a Spanish news show to 'sign-o your name-o in the book-o,'" Deft. 56.1 Stmt. ¶ 16; the second is Plaintiff's complaint to Williams about a week later that Grant "was treating people very mean, especially those who are Spanish speaking," *id.* ¶ 19; and the third is Plaintiff's complaint at the first "reset meeting," held on October 17, 2019 with Plaintiff, Grant, Williams, and Chowdhury, that Grant "was inappropriately handling not just the news reporter but all Spanish-speaking families," *id.* ¶ 34.

In order to constitute protected activity, an employee's complaint must be based on a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotation marks omitted). In particular, a plaintiff is "required to have had a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII." *Id.* (brackets and internal quotation marks omitted). However "[c]onduct directed entirely toward non-employees generally cannot be characterized as an unlawful employment practice by an employer." *Gerzhgorin v. Selfhelp Cmty. Servs., Inc.*, No. 22-808, 2023 WL 2469824, at *1 (2d Cir. Mar. 13, 2023) (summary order) (citing *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999)).

Plaintiff's complaints to her supervisors about Grant do not constitute protected activity under Title VII. Her only race-based complaints concerned Grant's conduct that, as Plaintiff

13

acknowledges, was "directed towards a visitor to her employer's place of business." Opposition at 7. They were about "another employee's use of insulting, abusive, and highly critical language based on a racial/ethnic origin against visitors to the employer's place of business." *Id.* at 2. But complaints about such conduct, directed toward a non-employee, are not protected under Title VII. *See Wimmer*, 176 F.3d at 134-35.

Of course, conduct directed at a non-employee may "contribute to a hostile work environment under some circumstances." *Gerzhgorin*, 2023 WL 2469824, at *1. That is because "conduct not directly targeted at or spoken to an individual but purposefully taking place in [that individual's] presence can nevertheless transform [the] work environment into a hostile or abusive one." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020). But Plaintiff did not complain to HNTB that she was subjected to a hostile work environment on the basis of any of protected characteristic that she possessed, as would be required for a complaint about Grant's comments to constitute a complaint about a hostile work environment for Plaintiff in violation of Title VII. Nor does Plaintiff even allege that she (or any other employee) shared the same race or ethnicity as the visitors who were on the receiving end of Grant's offensive language. *See, e.g.*, *Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043 (JPC), 2022 WL 2342693, at *7 (S.D.N.Y. June 29, 2022) (explaining that to prevail on a claim for a race-based hostile work environment, a plaintiff must show that the complained-of conduct "creates [a hostile or abusive] environment *because of the plaintiff's race*" (internal quotation marks omitted)). Instead, Plaintiff complained about potentially racially based conduct directed to non-employees, in conjunction with complaints about non-racially based conduct directed towards employees. Plaintiff therefore cannot prove that she was retaliated against for making such complaints. *See Wimmer*, 176 F.3d at 136 ("Because Wimmer did not introduce evidence that minority employees of the Department

felt that they worked in a racially hostile environment, Wimmer could not reasonably have believed that he was protesting an unlawful hostile work environment.").

Thus, because Plaintiff's complaints to her supervisors of conduct based on a protected characteristic were not "directed at an unlawful *employment practice* of [her] employer," they were not protected activity under Title VII and thus her retaliation claim is not cognizable under Title VII. *Id.* at 135; *see id.* at 134-35 (rejecting a police officer's "theory of recovery . . . that he was given poor evaluations and eventually terminated for having reported overhearing racial slurs made by police officers against black citizens and perhaps for questioning [another officer's] two stops of minority (Hispanic) motorists without cause" where plaintiff "offered no evidence . . . that there was unlawful discrimination with respect to the terms and conditions of employment within the [police department]"); *see also Silver v. KCA, Inc.*, 586 F.2d 138, 141 (2d Cir. 1978) ("The specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by employers against employees."). Without any evidence that she was engaged in protected activity, Plaintiff fails to make a *prima facie* case of retaliation under Title VII. For this reason, the Court grants HNTB's motion for summary judgment with respect to her Title VII claim.

### 2. Employer Justification and Pretext

Even if Plaintiff could make a *prima facie* showing of Title VII retaliation, that claim would still fail. That is because Plaintiff has adduced no evidence showing that HNTB's stated non-retaliatory reasons for her termination are pretext for unlawful retaliation. HNTB argues that it placed Plaintiff "on a PIP because she had an untenable working relationship with Ms. Grant, her work performance was poor, and HNTB had received complaints from the Port Authority about Plaintiff and Ms. Grant's relationship." Motion at 13-14. HNTB further points to Plaintiff's

15

relationship with Grant, Plaintiff's poor work performance, and downsizing from the Port Authority as non-retaliatory reasons for Plaintiff's termination. *Id.* at 14. These reasons, which all are supported by evidence in the record, *e.g.*, Deft. 56.1 Stmt. ¶¶ 48-49, 57, 68, 78-79, 89, 92, 100, establish non-retaliatory justifications for placing Plaintiff on a PIP and for her termination. Plaintiff has not offered any evidence showing these reasons to be a pretext for retaliation.

Instead, Plaintiff argues in response that HNTB "gives varying reason[s] for" Plaintiff's termination because it presents both Plaintiff's poor performance and downsizing as reasons for Plaintiff's termination, because HNTB had "work . . . available for an employee on April 14, 2021," and because "an employer cannot use discrimination to provoke an employee to insubordination and then terminate the employee on the basis of the very insubordination it has provoked." Opposition at 8.[4] These arguments are unavailing. As to the first, presenting multiple reasons for an action of course is not the same as presenting "inconsistent and varying explanations for [a] decision," which can create a question of pretext. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170-71 (2d Cir. 2001) (determining that multiple, consistent reasons did not create a question of pretext). The fact that HNTB had more than one reason to terminate Plaintiff does not help her case. Similarly, the fact that HNTB still had employees in April 2021 is not inconsistent with a need to downsize. Downsizing is not the same as closing up shop. Nor has Plaintiff presented evidence that HNTB somehow used discrimination to "provoke" her into insubordination. As discussed at *supra* III.A.1, no evidence has been presented that Plaintiff herself was subjected to discrimination. Instead, the record is replete with concerns about Plaintiff's work product,

---

[4] The Court notes that Plaintiff says nothing about pretext with respect to the PIP other than to say that her supervisors "instituted a PIP with the intended purpose of silencing her complaints," Opposition at 7, while citing to a portion of HNTB's Rule 56.1 statement concerning complaints about Plaintiff's performance made after the PIP and complaints from Plaintiff about being placed on the PIP, Deft. 56.1 Stmt. ¶ 65. This citation provides no support for Plaintiff's argument.

including concerns voiced by the Port Authority, and the record supports HNTB's claim that the Port Authority was downsizing its project. Plaintiff's supervisors notified Plaintiff that her untimely completion of work was "totally unacceptable," Deft. 56.1 Stmt. ¶ 82, highlighted performance issues at Plaintiff's performance reviews, *id.* ¶¶ 75-76 78-79, and internally discussed these issues, *id.* ¶¶ 66, 80, 84. HNTB even received complaints about Plaintiff's performance from Port Authority. *Id.* ¶ 90. And financial challenges were arising during the JFK Project. *Id.* ¶¶ 89, 92, 102.

Plaintiff therefore has not shown that HNTB's non-retaliatory reasons are a "mere pretext for retaliation," *Kwan*, 737 F.3d at 845. For this reason as well, the Court grants HNTB's motion for summary judgment with respect to Plaintiff's Title VII claim.

**B.     NYCHRL Claim**

Federal courts should avoid "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). For that reason, the Supreme Court has emphasized that a district court's discretion to exercise supplemental jurisdiction over related state-law claims "need not be exercised in every case in which it is found to exist." *Id.* In particular, if "federal claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* To be sure, "this statement does not establish a mandatory rule to be applied inflexibly in all cases." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (citation omitted). Rather, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Id.* at 350. But "in the usual case in which all federal-law claims are eliminated

before trial," those factors "will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.  In such cases, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* at 350 (footnote omitted).  Plaintiff has presented no argument as to why the Court should retain her NYCHRL claim if her Title VII claim were dismissed.  Therefore, the Court declines to exercise supplemental jurisdiction and, having granted summary judgment on the Title VII claim, dismisses the NYCHRL claim without prejudice.

## IV.  Conclusion

For the reasons stated above, the Court grants HNTB's motion for summary judgment on Plaintiff's Title VII claim and dismisses Plaintiff's NYCHRL claim without prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 26, enter judgment, and close this case.

SO ORDERED.

Dated: March 31, 2023
New York, New York

_____
JOHN P. CRONAN
United States District Judge